736 P.2d 829
**In the Matter of the APPEAL IN COCONINO COUNTY JUVENILE ACTION NO. J–10175.**

**No. 1 CA–JUV 362.**

Court of Appeals of Arizona,
Division 1, Department D.

April 28, 1987.

Navajo Legal Aid and Defender Service by Peter Breen, Window Rock, for appellant Father.

Navajo Nation Dept. of Justice by Donna C. Bradley, Window Rock, for intervenor-appellant.

Robert K. Corbin, Atty. Gen. by Macre S. Monson, Asst. Atty. Gen., Phoenix, for appellee ADES.

J. Michael Flournoy, Flagstaff, for appellee Mother.

KLEINSCHMIDT, Presiding Judge.

This case presents the question whether the trial court erred when it placed an Indian child in a non-Indian foster home. We hold that the court did err because it refused to apply the provisions of the Indian Child Welfare Act, 25 U.S.C.A. §§ 1901–1963.

The seven-year-old minor child, Jessica Brown/Jensen, is the daughter of Alan Brown, a Navajo, and Cindy Jensen, a non-Indian. The child is an enrolled member of the Navajo Tribe. The child's parents never married but lived together for over three years in Page, Arizona, a community adjacent to the Navajo Reservation. Thereafter, the child lived with her mother and stepfather. State authorities intervened when the stepfather abused the child. A dependency petition was filed in which the natural father intervened, seeking custody of the child. The court heard evidence on all issues.

At the hearing, Virginia Hannon, a social worker employed by the Navajo Tribe, testified that she had investigated Alan Brown's home and circumstances. She found that Brown lived in a new house, which was well furnished and had modern conveniences. Brown's parents lived nearby. She observed a visit that the child, Jessica, had with the Brown family in the summer of 1986. She described the child as affectionate towards her father and said that the whole family, including the child, acted as though they had always been together. She believed that placement with the father would not entail any physical or emotional suffering and recommended that Alan Brown be given custody of the child after Jessica became accustomed to his home.

James Cox, a psychotherapist who was familiar with the child, with the mother, and with Alan Brown, felt that Brown had the potential to be an adequate parent, but that he needed to be more consistent in keeping in contact with the child when she was living in a foster home.

Kate Johnson, a psychologist who had performed an evaluation of the child, had reservations about placing the child with her father because she was unsure of how familiar the child was with him. She believed a resolution of this question would require further study, and she did not want to make a firm judgment on the issue. She believed that it would involve considerable adjustment to place the child in a traditional Navajo home but saw no contraindications to placing her in an Indian home in Page. She believed that although the child had adapted well to her foster home, she could be moved again without trouble.

Daniel Cady, a psychologist, had performed an evaluation of Alan Brown. He found that Brown would be an adequate parent. He described Brown as neither a completely traditional Navajo nor a completely Anglicized individual.

A caseworker for the Department of Economic Security, Nancy Garduno, advised the court that she had prepared a case plan that called for the child to live with her father pending a final custody determination. This plan was modified because two of the natural mother's younger sisters had accused Alan Brown of molesting them while he was residing with them. These accusations first surfaced after Brown sought custody of the child. At the time of the hearing, the accusations were being investigated by the police. Ms. Garduno said that from all that she had observed, the child's relationship with her Navajo extended family was positive. She had no reason to think there was good cause to

place the child outside a Navajo home. She had investigated the school in Gallup which the child would attend if she lived with her father and found the curriculum appropriate to Jessica's needs.

The trial judge also heard testimony from Alan Brown, Cindy Jensen, and Cindy Jensen's husband. The judge then made the following findings and issued the following order:

The court finds facts as follows:

1. The minor child, Jessica Brown/Jensen, is the daughter of Cindy Jensen and Alan Brown.

2. Cindy Jensen, the mother, is an Anglo.

3. Alan Brown, the father, is an Indian, being an enrolled member of the Navajo Tribe.

4. The mother and father never married, but lived together for three and one-half years after the child was born. They lived in Page, Arizona, off of any reservation.

5. The mother and father separated, with the mother keeping the child. There has never been any formal court order concerning custody.

6. The mother married and continued to live in Page. She is still married to this husband, Bradley Jensen.

7. From the time of the child's birth until the initiation of this action, she has spent only a few hours on the Navajo Reservation and has had only minimum contacts with her Indian relatives. She has in all meaningful respects been raised as a non-Indian child.

8. In March, 1986, the child came to the attention of state agents because of an alleged act of abuse committed against her by her stepfather, Bradley Jensen.

9. The child was thereupon removed from the Jensen home and placed in an Anglo foster home in Page, where she is today.

10. Although Alan Brown had had very infrequent contacts with the child up to that point, he has been more assertive since being notified of these proceedings by DES, although he has without justifiable excuse missed some visits.

11. In June, 1986, Alan Brown caused the child to be enrolled as a member of the Navajo Tribe. This court has considered the child to be an Indian solely on the basis of said enrollment.

12. Also in June, 1986, the sisters of Cindy Jensen accused Alan Brown of having sexually assaulted them. These accusations are unresolved.

Conclusions of Law

1. The Indian Child Welfare Act, 25 U.S.C. Section 1901, does not apply.

The act is clearly designed to prevent culture shock and disturbance of Indian homes. It sensibly applies in situations where the state removes an Indian child from an Indian family and places the child in an Anglo foster home. However, it would cause evil to remove a partly Indian child who has always been raised as an Anglo from her Anglo home and place her in an Indian foster home. This is simply the other side of the culture shock coin.

2. It is in the best interests of this child to keep her in a situation most like that to which she is accustomed, namely an Anglo home in Page.

3. The mother's home is not a fit placement at present because of Bradley Jensen's [the stepfather] presence there.

4. The father's home is not a fit placement because it is remote, thrusts the child into a totally unfamiliar lifestyle, school and environment and due to the doubts about the father's character raised by the sexual claims are unresolved.

ORDER

Therefore the Court orders that the child shall remain in a foster home at the discretion of DES until she can be returned to the home of her mother.

We disagree with the judge's conclusion that the Indian Child Welfare Act does not apply. As we have previously recognized, the Act was enacted to " 'protect the best interests of Indian children and to promote

the stability and security of Indian tribes and families.' " *In re Maricopa County Juvenile Action No. A–25525*, 136 Ariz. 528, 531, 667 P.2d 228, 231 (App.1983) (quoting 25 U.S.C.A. § 1902). Congress acknowledged that " 'an alarmingly high percentage of Indian families are broken up by the removal ... of their children' and placement in non-Indian homes." *Id.* (quoting 25 U.S.C.A. § 1201(4)). The Act sets out " 'minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture' " *Id.* (quoting 25 U.S.C.A. § 1902).

■ The Act applies if the proceeding is a "child custody proceeding" as defined in the Act and the child is an "Indian child." An Indian child is a child who is a member of an Indian Tribe or a biological child of a member and eligible for membership in a tribe. 25 U.S.C.A. § 1903(4). It is undisputed that the proceeding was a child custody proceeding, and the trial judge expressly found that the child was an Indian child. The mother contests this latter finding on appeal. As we discuss in more detail later, however, the judge's finding was amply supported by the record.

■ Once it is determined that a dependency proceeding involves an Indian child, the judge *must*, in the absence of good cause to the contrary, follow the provisions of the Act. The child may not be placed in foster care unless the judge finds by clear and convincing evidence that parental custody is likely to result in serious physical or emotional harm to the child. 25 U.S.C.A. § 1912(e). The specific provision which governs foster care placement is 25 U.S.C.A. § 1915(b). It reads:

> (b) Foster care or preadoptive placements; criteria; preferences
>
> Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, *in the absence of good cause to the contrary*, to a placement with—
>
> (i) a member of the Indian child's extended family;
>
> (ii) a foster home licensed, approved, or specified by the Indian child's tribe;
>
> (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
>
> (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

25 U.S.C.A. § 1915(b) (emphasis added).

The prerequisites for the application of the Act are clearly met. We assume, therefore, that the trial judge's comments about its "sensible application," the "evil" of removing a child from a non-Indian to an Indian home when culture shock would result, and the remoteness of the father's home were made in an attempt to establish the necessary good cause not to follow the Act.

■ The question thus becomes whether the reasons articulated by the judge constitute good cause to avoid the provisions of the Act. In our opinion they do not. We realize that most cases dealing with the placement of Indian children will involve children who have been living in an Indian home. The fact that a child may have been living in a non-Indian home is no reason, standing alone, to dispense with the provisions of the Act. *See In re Adoption of Halloway*, 732 P.2d 962 (Utah 1986). When the Act is read as a whole, it is clear that Congress has made a very strong policy choice that Indian children, including those who have a non-Indian parent, belong in an Indian home. Assuming that the remoteness of the Indian home and "culture shock" may be valid considerations in deciding whether there is good cause not to follow the preferences expressed in the Act in a given case, on the record before the trial court in this matter, we find that it was an abuse of discretion not to apply the

preferences. The child had actually lived with her Indian father for three years, although concededly not in a purely reservation setting. The evidence shows that the child had a real attachment to, and affection for, her father and the other members of his family. None of the professionals familiar with the people involved raised any substantial objection to placement in an Indian home. The mother expressed no objection to Jessica's exposure to Indian culture but thought that another move would not be good for the child. The father lived in a small community within twenty miles of Gallup, where the evidence showed that services and schooling for the child were adequate.

We do not rule that the trial judge must order this child placed with her father. The judge never resolved the allegations that the father was a child molester. These are accusations that the trial judge must resolve in making a decision, based on all of the evidence now before him or which may come before him in subsequent proceedings. The judge may not order foster care, however, unless he determines, by clear and convincing evidence, including testimony from a qualified expert, that parental placement is likely to result in serious emotional or physical harm to the child. 25 U.S.C.A. § 1912(e). If the trial judge finds that the father is not a fit parent he must, in the absence of good cause based on something more than has been presented in this case so far, follow the placement hierarchy dictated by 25 U.S.C.A. § 1915(b).

■ Finally, we address the question raised by the mother as to whether Alan Brown was really the father of the child. While Brown's fatherhood was never the subject of a formal paternity proceeding, he has acknowledged paternity and enrolled the child in the Navajo Tribe. Brown is listed as the father on the birth certificate. Cindy Jensen said that he was probably the father, although she was unsure. She remembered when and where she believed the child was conceived, and while she was carrying the child she told Brown that she was pregnant by him. After Cindy became pregnant, her parents directed Cindy to approach Brown's parents for money for an abortion. Brown took Cindy to a Public Health Service Hospital on the reservation to have the child delivered, and following the birth Brown helped care for the child. The evidence adequately supports the court's finding that Alan Brown is the natural father of the child.

The order of the trial court is vacated and this matter is remanded for further proceedings consistent with this opinion.

SHELLEY and BROOKS, JJ., concur.