IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO
_____

IN RE DEPENDENCY OF M.K.

Nos. 2 CA-JV 2025-0038, 2 CA-JV 2025-0039,
and 2 CA-JV 2025-0040 (Consolidated)
Filed May 1, 2026

_____

Appeal from the Superior Court in Cochise County
No. JD202300032
The Honorable John F. Kelliher Jr., Judge

**REVERSED AND REMANDED**

_____

COUNSEL

Kristin K. Mayes, Arizona Attorney General
By Dawn R. Williams, Assistant Attorney General, Tucson
*Counsel for Appellant Department of Child Safety*

Jacobson, Magnuson, Anderson & Halloran P.C., Saint Paul, Minnesota
By Joy P. Parker and Joseph Halloran
*Counsel for Intervenor/Appellant White Earth Indian Child Welfare*

Kewenvoyouma Law PLLC, Tempe
By Verrin T. Kewenvoyouma and Lorenzo E. Gudino, Pro Hac Vice
*Counsel for Intervenor/Appellant Melissa K.*

Charles N. Kendall Jr., Cochise County Public Defender
By Brian J. Molitor, Deputy Public Defender, Sierra Vista
*Counsel for Appellee Minor M.K.*

Nuccio & Shirly P.C., Tucson
By Salvatore Nuccio
*Counsel for Intervenors/Appellees Ryann D. and Denisse A.H.*

Rothstein Donatelli LLP, Tempe
By April E. Olson and Wouter Zwart

and

Native American Rights Fund, Anchorage, Alaska
By Sydney Tarzwell, Pro Hac Vice

and

Indian Law Clinic, Michigan State University College of Law, East
Lansing, Michigan
By Kathryn Fort, Pro Hac Vice
*Counsel for Amici Curiae Fort McDowell Yavapai Nation, Gila River Indian
Community, Navajo Nation, Pascua Yaqui Tribe, Salt River Pima-Maricopa
Indian Community, and Tohono O'odham Nation*

---

**OPINION**

---

Presiding Judge Vásquez authored the opinion of the Court, in which
Chief Judge Staring and Judge Brearcliffe concurred.

---

V Á S Q U E Z, Presiding Judge:

¶1        In this dependency proceeding, the Department of Child
Safety (DCS), along with intervenors the White Earth Nation and Melissa
K., (collectively, "appellants") challenge the juvenile court's May 2025 order
finding good cause to deviate from the placement preferences of the Indian
Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901–1963, and allowing
M.K. to remain with his current non-relative, non-Indian placement.  For
the following reasons, we reverse the court's order and remand the case
with directions to grant the motion for change of physical custody.

**Factual and Procedural Background**

¶2        M.K. was born to Raven I. and Caleb K. in February 2023.  He
was born substance exposed, and, shortly after their discharge from the
hospital, Raven relapsed and left M.K. in the care of his paternal
step-grandmother.  Caleb was also using drugs at the time.  In April 2023,
DCS filed a dependency petition, alleging that M.K. was dependent as to

both parents due, in part, to their substance abuse and inability to provide M.K. with basic necessities. M.K. was eligible for enrollment with the White Earth Nation.

¶3 At the initial dependency hearing in early May 2023, the juvenile court found that ICWA applied, and, after Raven did not object, the court found good cause to deviate from the ICWA placement preferences. Raven expressed her desire to enter a no-contest plea to the allegations in the dependency petition, and the court accepted her plea. However, the court granted DCS's request not to adjudicate M.K. dependent until a qualified expert witness (QEW) was available to testify, as required by ICWA. Days later, DCS provided notice to the White Earth Nation and the Bureau of Indian Affairs (BIA) of the proceeding and the next scheduled hearing. M.K. was placed in a non-Indian, licensed foster home in Marana with Ryann D. and Denisse A.H.

¶4 At the next hearing in July 2023, counsel for DCS explained that they had yet to receive a response from the White Earth Nation, and the juvenile court found the tribe had been properly served with notice but failed to appear. There being no objection, the court also found good cause to deviate from the ICWA placement preferences, keeping M.K. with Ryann and Denisse. In October 2023, the court dismissed Caleb as a party to the proceeding after he had died.

¶5 In January 2024, DCS identified M.K.'s paternal great-grandmother, who lives in Minnesota, and his paternal cousin Melissa, who lives in Phoenix with her husband and son, as possible placements. Several months later, in June 2024, DCS filed a motion for change of physical custody of M.K. to Melissa. Ryann and Denisse sought to intervene in the matter to contest the removal. Melissa also sought to intervene, with DCS joining her motion. The juvenile court granted both motions to intervene and scheduled an evidentiary hearing on the motion for change of physical custody.

¶6 At a September 2024 hearing, the juvenile court heard testimony from a QEW. Afterward, it again accepted Raven's no-contest plea and then adjudicated M.K. dependent as to her.[1] No objection having been made, the court also found good cause to deviate from the ICWA placement preferences. The QEW did not object to the deviation at that

---

[1] Although the juvenile court previously found M.K. was "a dependent child," it later explained that it had mistakenly done so because QEW testimony had not yet been received.

time, apparently because he opposed disrupting the placement before the hearing on the motion for change of physical custody.

¶7 A four-part evidentiary hearing on the motion for change of physical custody was held between January and May 2025. On the first day, counsel for the White Earth Nation appeared and requested to intervene on the tribe's behalf. The juvenile court granted that request. In May 2025, the court issued its order finding good cause to deviate from the ICWA placement preferences and denying DCS's motion for change of physical custody. This appeal followed.

**Jurisdiction**

¶8 We, as well as the appellants, recognize the inconsistency in our case law concerning whether we have appellate jurisdiction over this matter. In prior cases of a similar procedural posture, this court has both determined that it had appellate jurisdiction, *Gila River Indian Cmty. v. Dep't of Child Safety*, 238 Ariz. 531, ¶ 7 (App. 2015); *Navajo Nation v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 339, ¶ 12 (App. 2012), and has accepted special-action jurisdiction without deciding whether it had appellate jurisdiction, *Navajo Nation v. Dep't of Child Safety*, No. 1 CA-JV 21-0225, ¶ 23 (Ariz. App. Feb. 10, 2022) (mem. decision); *Alexandra K. v. Dep't of Child Safety*, No. 1 CA-JV 19-0081, ¶ 11 (Ariz. App. Oct. 17, 2019) (mem. decision).

¶9 Our jurisdiction is prescribed by statute. *Brionna J. v. Dep't of Child Safety*, 247 Ariz. 346, ¶ 7 (App. 2019). Section 8-235, A.R.S., provides this court with appellate jurisdiction over "a final order of the juvenile court." Rule 601(b), Ariz. R. P. Juv. Ct., then sets forth a comprehensive list of what constitutes a "final order."

¶10 As relevant here, Rule 601(b)(2)(M) provides that final orders include "any other order that is final pursuant to Arizona case law." When this rule was enacted in July 2022, Ariz. Sup. Ct. Order R-20-0044 (Dec. 8, 2021), at least two published cases indicated that we had appellate jurisdiction in these circumstances, *Gila River Indian Cmty.*, 238 Ariz. 531, ¶ 7; *Navajo Nation*, 230 Ariz. 339, ¶ 12. We presume our supreme court was aware of this case law when enacting Rule 601(b)(2)(M). *Cf. Cochise County v. Faria*, 221 Ariz. 619, ¶ 13 (App. 2009) (assuming legislature knows existing law when enacting statute). Moreover, the application of ICWA makes this case distinguishable from the typical placement determination over which we lack appellate jurisdiction. *See Jessicah C. v. Dep't of Child Safety*, 248 Ariz. 203, ¶¶ 10-17 (App. 2020) (we consider practical effect of order to determine finality); *see also* 25 U.S.C. § 1915 (federal policy providing placement preferences for dependent Indian children); *Navajo*

*Nation*, 230 Ariz. 339, ¶ 14 (we construe ICWA liberally in favor of preserving tribal families); *In re Coconino Cnty. Juv. Action No. J-10175*, 153 Ariz. 346, 349 (App. 1987) (trial court "*must*, in the absence of good cause to the contrary," follow ICWA). We therefore conclude we have appellate jurisdiction here.[2]

**Discussion**

**¶11**  Appellants maintain that the juvenile court erred in finding good cause to deviate from the ICWA placement preferences. We review the court's finding of good cause for an abuse of discretion. *Navajo Nation*, 230 Ariz. 339, ¶ 14. A court abuses its discretion if it misapplies the law, it fails to consider the evidence, it commits an error of law in reaching a discretionary decision, or there is no substantial basis for its discretionary findings. *Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, ¶ 13 (App. 2012); *Grant v. Ariz. Pub. Serv. Co.*, 133 Ariz. 434, 455-56 (1982).

**¶12**  In 1978, Congress enacted ICWA to address, in part, the "alarmingly high percentage of Indian families [that] are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." 25 U.S.C. § 1901(4). To that end, Congress established minimum standards "for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902. Thus, "[b]y enacting ICWA, 'Congress declared a two-fold national policy: the protection of the best interests of Indian children, and the promotion of stable and secure Indian tribal entities.'" *Gila River Indian Cmty.*, 238 Ariz. 531, ¶ 14 (quoting *In re Pima Cnty. Juv. Action No. S-903*, 130 Ariz. 202, 203 (App. 1981)). In short, Congress expressly enacted ICWA to address special circumstances arising in cases involving Indian children.

**¶13**  "ICWA articulates a strong federal policy that, 'where possible, an Indian child should remain in the Indian community.'" *Id.* ¶ 15 (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 37 (1989)). In making foster care or preadoptive placements, courts must give preference, "in the absence of good cause to the contrary," to a placement with: (1) "a member of the Indian child's extended family"; (2) "a foster home licensed, approved, or specified by the Indian child's tribe"; (3) "an Indian foster

---

[2]Even if we lacked appellate jurisdiction, we would exercise our discretion to accept special-action jurisdiction. *See Brionna J.*, 247 Ariz. 346, ¶ 14 ("Given the fluid, time-sensitive nature of placement determinations, we find it appropriate to exercise special action jurisdiction here.").

home licensed or approved by an authorized non-Indian licensing authority"; or (4) "an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs." 25 U.S.C. § 1915(b). These placement preferences "are hierarchical," meaning courts "may only place the child with someone in a [hierarchically] lower-ranked group when there is no available placement in a higher-ranked group." *Haaland v. Brackeen*, 599 U.S. 255, 267 (2023). Arizona courts are bound to apply these placement preferences in ICWA cases. *Id.* at 286; *see also* A.R.S. § 8-815(b); Ariz. R. P. Juv. Ct. 111(a).

¶14 ICWA does not define "good cause." *Navajo Nation*, 230 Ariz. 339, ¶ 19. However, the BIA promulgated regulations, published in the Code of Federal Regulations, which provide guidance, and to which our courts are similarly bound.[3] *See* 25 C.F.R. § 23.101; *see also* Ariz. R. P. Juv. Ct. 321(b) (juvenile court "must" follow 25 C.F.R. §§ 23.131 through 23.132 in departing from ICWA placement preferences). According to 25 C.F.R. § 23.132(c), a court's finding of good cause to depart from the ICWA placement preferences "should be based on one or more of the following":

> (1) The request of one or both of the Indian child's parents, if they attest that they have reviewed the placement options, if any, that comply with the order of preference;
>
> (2) The request of the child, if the child is of sufficient age and capacity to understand the decision that is being made;
>
> (3) The presence of a sibling attachment that can be maintained only through a particular placement;
>
> (4) The extraordinary physical, mental, or emotional needs of the Indian child, such as specialized treatment services that may be unavailable in the community where

---

[3]In 2016, the BIA adopted binding regulations to aid in the uniform implementation of ICWA. *Holly C. v. Tohono O'odham Nation*, 247 Ariz. 495, n.17 (App. 2019). "Our supreme court has amended juvenile court rules to reflect the authority of these regulations." *Id.*

> families who meet the placement
> preferences live;
>
> (5) The unavailability of a suitable placement
> after a determination by the court that a
> diligent search was conducted to find
> suitable placements meeting the preference
> criteria, but none has been located. . . .

*See also* Ariz. R. P. Juv. Ct. 321(b)(3). However, a "placement may not depart from the preferences based solely on ordinary bonding or attachment that flowed from time spent in a non-preferred placement that was made in violation of ICWA." 25 C.F.R. § 23.132(e); *see also* Ariz. R. P. Juv. Ct. 321(b)(5).

¶15 This "good cause" exception is an integral part of ICWA's placement preferences, which has been described as "[t]he most important substantive requirement imposed on state courts." *Miss. Band of Choctaw Indians*, 490 U.S. at 36. This is so because "the presumption is that placement of the child in accordance with ICWA preferences *is* in the best interest of the child." *Navajo Nation*, 230 Ariz. 339, ¶ 18. Thus, a party asserting good cause to deviate from the placement preferences bears the burden of proof by clear and convincing evidence. Ariz. R. P. Juv. Ct. 321(b)(2); *see Gila River Indian Cmty.*, 238 Ariz. 531, ¶ 19. This heightened standard fosters ICWA's policies and the placement preferences identified therein. *Gila River Indian Cmty.*, 238 Ariz. 531, ¶¶ 18-19; *see also Kent K. v. Bobby M.*, 210 Ariz. 279, ¶ 25 (2005) (evidence is clear and convincing if it makes the thing to be proved highly probable or reasonably certain).

¶16 Here, in its May 2025 order, the juvenile court determined that 25 C.F.R. § 23.132(c)(2), (3), and (5) did not apply, instead apparently relying on (1) and (4). The court, however, made only two conclusions of law in reaching its ultimate decision. First, the court found "by clear and convincing evidence that [M.K.] would suffer trauma if removed from his current placement, as well as the service providers currently in place, and that trauma would be severe, and is not in [M.K.'s] best interest." Second, the court found "by clear and convincing evidence that the extraordinary physical, mental and emotional needs of [M.K.] are such, that removing him from his current placement places [him] at a significant risk of future harm." Appellants challenge several aspects of the court's order, which we address in turn.

¶17 At the outset, however, we want to acknowledge our general legal principles that we presume the juvenile court knows and applies the

law and that we do not reweigh evidence on appeal, instead deferring to the juvenile court's ability to make factual findings and credibility determinations. *See Fuentes v. Fuentes*, 209 Ariz. 51, ¶ 32 (App. 2004); *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, ¶ 12 (App. 2002). These important principles are the foundation of appellate review. In this case, in light of the juvenile court's numerous legal errors and highly inappropriate statements, as explained below, these principles have limited applicability. *See Brewer v. Peterson*, 9 Ariz. App. 455, 458 (1969) ("The controlling law, as we see it, is that an appellate court must assume that the trial court did no wrong, *in the absence of a showing to the contrary*.") (emphasis added).

## I.     Trauma

**¶18**      Appellants first challenge the sufficiency of the evidence to support the juvenile court's conclusion that M.K. "would suffer trauma if removed" from Ryann and Denisse. They maintain that this conclusion was based on "the court's own theories and opinions" and overlooks testimony that "being raised by blood relatives is protective against the early trauma of removal and foster care changes for Indian children, and that Indian children raised with relatives have better long-term mental health outcomes."

**¶19**      Trauma is not identified in 25 C.F.R. § 23.132(c) as a relevant consideration to justify departing from the ICWA placement preferences. However, the juvenile court tied its finding of trauma in this case to M.K.'s best interests, which may nonetheless be considered. *See Navajo Nation*, 230 Ariz. 339, ¶¶ 17, 22. Yet, we must bear in mind that "Congress was skeptical of using 'vague standards like the best interests of the child,' and intended good cause to be a limited exception, rather than a broad category that could swallow the rule." Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38847 (quoting H.R. Rep. No. 95-1386, at 19 (1978)). As the Supreme Court has explained, ICWA requires state courts "to place an Indian child with an Indian caretaker, if one is available," regardless of whether "the child is already living with a non-Indian family and the state court thinks it in the child's best interest to stay there." *Haaland*, 599 U.S. at 264.

**¶20**      Here, M.K.'s pediatrician, Dr. Samantha Mansfield, and an early intervention specialist, Pamela Abare, who has been providing M.K. with developmental support, testified that M.K. will suffer "trauma" if his placement is changed to Melissa. They seemingly agreed this is not due to any fault of Melissa but, instead, the "change" or "disruption" itself and the trauma would be "exacerbated" by M.K.'s developmental issues and other conditions. But both Dr. Mansfield and Abare admitted to being unfamiliar

with studies establishing harm to Indian children when they are removed from their family or reservation.

¶21 Christina Andrews, the executive director for a Native American health organization, testified specifically as to that harm. She described the "generational trauma" for the Indian community and the corresponding importance of an Indian child being placed with a blood relative, as opposed to a non-Indian foster family. She further explained that placing an Indian child with a non-Indian foster family can result in a sense of "ambiguous loss" for the child, as well as aggression and anger, which can ultimately engender feelings of disenfranchisement and lead to mental-health issues and substance abuse.

¶22 It appears that the juvenile court did not consider Andrews's testimony. The court found that "[t]he other parties did not offer any evidence to contradict the testimony and opinions of Dr. Mansfield and Pamela Abare." But Andrews's testimony did just that, at least with regard to the potential harm or trauma M.K. could suffer as a result of his placement not being changed to a blood relative versus remaining with a non-Indian foster family. *Cf. Johnson v. Elson*, 192 Ariz. 486, ¶ 11 (App. 1998) (we may infer additional findings of fact and conclusions of law necessary to sustain trial court's order "as long as those findings are reasonably supported by the evidence, and *not in conflict with any express findings*" (emphasis added)). Indeed, underlying ICWA is "Congress' concern over the placement of Indian children in non-Indian homes . . . based in part on evidence of the detrimental impact on the children themselves of such placements outside their culture." *Miss. Band of Choctaw Indians*, 490 U.S. at 49-50. As stated in findings adopted by Congress in establishing ICWA, "removal of Indian children from their cultural setting seriously impacts a long-term tribal survival and has damaging social and psychological impact on many individual Indian children." *Id.* at 50 (quoting S. Rep. No. 95-597, at 52 (1977)); *see Haaland*, 599 U.S. at 303-05 (Gorsuch, J., concurring) (discussing "long-lasting adverse health and emotional effects"); *see also Miss. Band of Choctaw Indians*, 490 U.S. at 33 & n.1 (discussing "serious adjustment problems" for Indian children, during adolescence, placed in non-Indian homes).

¶23 Additionally, the juvenile court apparently disregarded Abare's testimony that any trauma M.K. would suffer as a result of changing his placement could be minimized with a thoughtful transition plan. As stated above, we do not reweigh the evidence. *See Jesus M.*, 203 Ariz. 278, ¶ 12. But the record here establishes this fact, which was not otherwise challenged and yet appears nowhere in the court's ruling. *See State v. Matthews*, No. 2 CA-CR 2024-0106, ¶ 16, 2026 WL 73963 (Ariz. App.

Jan. 9, 2026) (superior court erred by overlooking undisputed evidence). The court thus abused its discretion in failing to consider this evidence. *See Ruben M.*, 230 Ariz. 236, ¶ 13; *Grant*, 133 Ariz. at 455-56.

## II. Extraordinary Physical, Mental, or Emotional Needs

¶24 Appellants also challenge the juvenile court's conclusion that M.K.'s "extraordinary physical, mental, and emotional needs" are such "that removing him from his current placement places [him] at a significant risk of future harm." They argue that the court failed to explain what M.K.'s "'extraordinary physical, mental and emotional needs' are or what 'future harm' he would be at risk of."

¶25 Under ICWA, "the physical, mental, and emotional needs of the Indian child [are] paramount." Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38839. As such, 25 C.F.R. § 23.132(c)(4) provides courts with discretion "to consider any unique needs of a particular Indian child" in determining whether to deviate from the placement preferences. *Id.* at 38844. However, those needs must be "extraordinary." 25 C.F.R. § 23.132(c)(4); *see also Extraordinary*, Merriam-Webster, https://merriam-webster.com (last visited Mar. 3, 2026) ("going beyond what is usual, regular, or customary"); *Extraordinary*, Black's Law Dictionary (12th ed. 2024) ("[b]eyond what is usual, customary, regular, or common").

¶26 In addition, 25 C.F.R. § 23.132(c)(4) provides an important qualification: "The extraordinary physical, mental, or emotional needs of the Indian child, *such as specialized treatment services that may be unavailable in the community where families who meet the placement preferences live*." (Emphasis added.) Although this language does not limit 25 C.F.R. § 23.132(c)(4) to only that situation—unavailable services—it provides an important guidepost in the regulation's application. *See Such as*, Merriam-Webster, https://merriam-webster.com (last visited Apr. 2, 2026) ("used to introduce an example or series of examples").

¶27 In this case, Dr. Mansfield testified that, largely because M.K. was born substance-exposed, he had speech delays, gross-motor delays, developmental delays, exotropia (meaning one of his eyes turns in a different direction), and bilateral ear tubes. She also testified that he was at risk of being on the autism spectrum. But she explained that when they administered a standardized test to evaluate M.K.'s development, the results were not "extremely abnormal" and that she did not consider certain behaviors exhibited by M.K.—specifically, "tantrumming"—to be unusual. Abare also testified that M.K.'s needs were "out of the ordinary" for "children on the whole" but not for other substance-exposed children.

**¶28**        To address these concerns, M.K. was attending speech therapy and had graduated from physical therapy.  He was seeing an ophthalmologist and wearing an eye patch to treat the exotropia.  He was meeting with Abare to address his developmental needs and he was seeing a developmental pediatrician in addition to Dr. Mansfield to monitor the other concerns.

**¶29**        As appellants point out, the juvenile court did not articulate why it concluded that M.K.'s "extraordinary physical, mental and emotional needs" were such that deviation was appropriate.  Assuming the court was concerned about his medical and developmental needs as identified above, neither Dr. Mansfield nor Abare testified that these needs were, in and of themselves, "extraordinary."  Instead, they seemed to suggest that M.K.'s needs were manageable.

**¶30**        Perhaps more importantly, the record shows that for all of M.K.'s medical and developmental needs, there were appropriate service providers available in the Phoenix area, if he were to be placed with Melissa.  Indeed, at least some of the providers M.K. currently sees in Tucson could continue to see him virtually in Phoenix.  There is thus no substantial basis in the record for the juvenile court's conclusion that "the extraordinary physical, mental and emotional needs of [M.K.] are such, that removing him from his current placement places [him] at a significant risk of future harm."  *See Ruben M.*, 230 Ariz. 236, ¶ 13; *Grant*, 133 Ariz. at 455-56.

**¶31**        Appellants also contend that the juvenile court's "extraordinary needs" finding was actually based on its finding that M.K. had "attached" to Ryann and Denisse.  They further maintain, "Because M.K.'s foster placement was made in violation of ICWA's Notice and QEW requirements, the [c]ourt's reliance solely on bonding with [Ryann and Denisse] for its good cause determination is an error of law."

**¶32**        Under ICWA, "[n]o foster care placement . . . proceeding shall be held until at least ten days after receipt of notice by . . . the tribe or the Secretary."  25 U.S.C. § 1912(a).  In addition, the juvenile court cannot order a foster care placement "in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."  25 U.S.C. § 1912(e).

**¶33**        Here, in May 2023, the juvenile court found good cause to deviate from the ICWA placement preferences, allowing M.K. to be placed with Ryann and Denisse.  However, the White Earth Nation and the BIA

did not receive notice of the proceeding until after that hearing. In addition, the court did not hear testimony from the QEW until September 2024, after it had repeatedly found good cause to deviate from the ICWA placement preferences and allowed M.K. to remain with Ryann and Denisse. Because a foster placement ordered without QEW testimony violates ICWA, the court could not depart from the placement preferences "based solely on ordinary bonding or attachment that flowed from time spent" in that placement. 25 C.F.R. § 23.132(e); *see also* Ariz. R. P. Juv. Ct. 321(b)(5).

¶34 We recognize the difficulty in complying perfectly with ICWA, particularly given the time constraints and sometimes immediate need to place an at-risk child. However, the purpose of 25 C.F.R. § 23.132(e) is to address "concerns that parties may benefit from failing to identify that ICWA applies, conduct the required notifications, or identify preferred placements." Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38846. While it can be difficult for children to shift between placements, "one way to limit any disruption is to mandate careful adherence to procedures that minimize errors in temporary or initial custodial placements." *Id.*

¶35 Based on the record before us, we agree with appellants that M.K.'s attachment to Ryann and Denisse was, at bottom, the basis of the juvenile court's decision. The court noted in its findings of fact that M.K. had "attached" to Ryann and Denisse "during the time 'good cause' was found to deviate from ICWA preferences and before the ICWA preferred placement was identified." However, there was no corresponding finding of M.K.'s attachment to Melissa and her family, despite their "significant" visitation with each other. To the extent the court relied solely on M.K.'s bonding with Ryann and Denisse to justify deviating from the placement preferences, it erred as a matter of law because the initial placement was made in violation of ICWA.[4] *See* 25 C.F.R. § 23.132(e).

---

[4]Viewing the record as a whole, we have little confidence that the juvenile court meaningfully considered the ICWA requirements. Notably, the court made a number of gratuitous, unprofessional statements related to the applicability of ICWA. And when counsel for the White Earth Nation was trying to explain to the court how it had violated ICWA, the court seemingly denied all fault, instead blaming the tribe for its untimely response. The court sarcastically quipped that the tribe could have used "carrier pigeon[s], smoke signals." Such comments are racially charged and extremely inappropriate.

## III.    Parent's Placement Preference

**¶36**         DCS also argues that the juvenile court erred by failing to consider Raven's preference that M.K. be placed with Melissa.  DCS points out that, "in its conclusions of law, although the court listed the parental preference language from the regulations, it did not indicate that the court considered [Raven's] preference."

**¶37**         As stated above, under the regulations, in determining whether there is good cause to deviate from the ICWA placement preferences, the court "should" consider "[t]he request of one or both of the Indian child's parents, if they attest that they have reviewed the placement options, if any, that comply with the order of preference."[5]   25 C.F.R. § 23.132(c)(1); *see also* Ariz. R. P. Juv. Ct. 321(b)(3)(A).  The provision requiring an attestation is "intended to help address concerns about coercion."  Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38844.

**¶38**         Here, in its findings of fact, the juvenile court found that Raven had not "attested to having reviewed the placement options" but that her attorney "represented" that she preferred Melissa.  Then, in its conclusions of law, the court identified 25 C.F.R. § 23.132(c)(1) as relevant but made no finding as to Raven's preference.  The record in this case makes clear that Raven preferred M.K. to be placed with Melissa.  But under 25 C.F.R. § 23.132(c)(1), a parent's preference is relevant only if he or she prefers a non-compliant placement, thereby providing good cause to deviate.  That was not the case here.

**¶39**         Nevertheless, ICWA itself plainly provides:  "Where appropriate, the preference of the Indian child or parent shall be considered."   25 U.S.C. § 1915(c); *see also* Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38844 ("The statute explicitly provides that, where appropriate, preference of the parent must be considered.").  This statute does not require an attestation.  25 U.S.C. § 1915(c).  The juvenile court did not cite this provision or otherwise make any conclusion of law

---

[5]The regulations indicate that good cause "should" be based on one or more of the five listed factors.  25 C.F.R. § 23.132(c); *see also* Ariz. R. P. Juv. Ct. 321 (court "must" follow 25 C.F.R. § 23.132).  We need not resolve here if "should" limits the good cause finding to only those five factors. *Contrast* Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38839 ("should" leaves open possibility that, in extraordinary circumstances, court may find good cause to deviate from placement preferences for some other reason), *with McNutt v. McNutt*, 203 Ariz. 28, ¶ 26 (App. 2002) ("should" most commonly expresses obligation or duty).

related to Raven's preference. It again erred in this regard. *See Ruben M.*, 230 Ariz. 236, ¶ 13; *Grant*, 133 Ariz. at 455-56.

## IV. Burden Shifting

**¶40** Appellants also contend the juvenile court "improperly shifted the burden of proof" by comparing placement with Ryann and Denisse with that of Melissa, essentially putting them on "equal footing." They point out the "strong presumption in favor of ICWA's placement preference," namely, Melissa.

**¶41** As stated above, 25 U.S.C. § 1915(b) directs that a placement preference "shall" be given to the Indian child's extended family and tribe. *See Joshua J. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 417, ¶ 11 (App. 2012) ("shall" usually indicates mandatory provision). "'Giv[ing]' a 'preference' means more than mere prioritization—it connotes the active bestowal of advantages on some over others." Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38839 (alteration in Indian Child Welfare Act Proceedings) (quoting 25 U.S.C. § 1915(a)) (discussing identical language in 25 U.S.C. § 1915(a) that "preference shall be given, in the absence of good cause to the contrary").

**¶42** Here, as appellants point out, the juvenile court found that M.K. had two "willing placements able to care for him." It also compared the placements, noting that they both had taken steps to introduce M.K. to his heritage. These statements fail to recognize that Melissa, as an extended family member, is the preferred placement. *See* 25 U.S.C. § 1915(b). Although the court noted that ICWA "require[s] placement" of M.K. with Melissa absent clear and convincing evidence of good cause to deviate, this statement was empty and insincere insofar as the court failed to meaningfully apply the preference. *See Gila River Indian Cmty.*, 238 Ariz. 531, ¶ 15; *see also Haaland*, 599 U.S. at 267 (Indians from any tribe outrank unrelated non-Indians).

**¶43** The burden was on Ryann and Denisse, as well as M.K., who opposed the ICWA-compliant placement, to establish good cause to deviate by clear and convincing evidence. *See* Ariz. R. P. Juv. Ct. 321(b)(2); *Gila River Indian Cmty.*, 238 Ariz. 531, ¶ 19. However, the juvenile court made several factual findings that seemed to place the burden on Melissa to present evidence establishing that she was the most appropriate placement. First, as discussed above, the court found that Melissa had failed to present evidence to contradict the testimony of Dr. Mansfield and Abare. Second, the court found that Melissa had been "unable to take full advantage of the times available" for visitation with M.K. Third, the court found that she

had not "reached out to [M.K.'s] current services providers" and had not "identified service providers in [Phoenix] to replace the ones in Tucson." Because of Melissa's position as the preferred placement, however, none of these factual findings bear on the issue of whether Ryann and Denisse and M.K. met their burden of proof.

## V.    Conclusion

¶44      The record before us does not contain clear and convincing evidence of good cause to deviate from the ICWA placement preferences. Melissa, as M.K.'s cousin, is the preferred placement. *See* 25 U.S.C. § 1915(b). It is presumed that M.K. being placed with Melissa is in M.K.'s best interests. *See Navajo Nation*, 230 Ariz. 339, ¶ 18. Raven also prefers that M.K. be placed with Melissa. *See* 25 U.S.C. § 1915(c). M.K. does have significant medical and developmental needs; however, those needs are being addressed, and it is undisputed that services are readily available in Phoenix, where Melissa lives. *See* 25 C.F.R. § 23.132(c). It is also undisputed that a thoughtful transition plan could alleviate added trauma to M.K. stemming from a change in placement. In addition, because M.K.'s initial placement with Ryann and Dennise was made in violation of ICWA, his bonding with them—which we have no doubt exists—cannot serve as the sole basis of good cause to deviate. *See* 25 C.F.R. § 23.132(e).

¶45      This is precisely the type of case that ICWA was enacted to address. *See Haaland*, 599 U.S. at 265-66; *Gila River Indian Cmty.*, 238 Ariz. 531, ¶ 14. We have an Indian child with both an extended family member and a non-Indian foster family wishing to serve as placement. Because, as a matter of law based on the record before us, no one could reasonably find good cause to deviate by clear and convincing evidence, we are compelled to reverse the juvenile court's order.[6] *See Brionna J.*, 255 Ariz. 471, ¶ 31.

---

[6]Because of this outcome, we need not address the White Earth Nation and Melissa's additional argument that the juvenile court was biased "throughout the proceedings." In any event, because this issue was not raised below, it is waived on appeal. *See Richter v. Dairy Queen of S. Ariz., Inc.*, 131 Ariz. 595, 596 (App. 1982) (appellate court cannot consider issues and theories not presented below); *K.B. v. State Farm Fire & Cas. Co.*, 189 Ariz. 263, 268 (App. 1997) (appellate court "generally [does] not consider arguments, including ones concerning constitutional issues, raised for the first time on appeal").

**Disposition**

¶46      This case is difficult because M.K. has two placements who love him and want to care for him. However, in an ICWA case like this, the law gives a strong preference to extended family members like Melissa. Our courts must recognize that, as a matter of law, best interest determinations involving Indian children are to be treated differently and must be made in accord with ICWA. It is simply not sufficient to apply the standard best-interests calculations our courts routinely and daily apply in non-Indian children placements. The burden on those wanting to deviate from that preference is steep—clear and convincing evidence of good cause. That standard was not met here.

¶47      This case is also troubling because the juvenile court's ruling was replete with errors. Had those errors not been made, M.K. could have been transitioned to living with Melissa sooner. Instead, the delay has undoubtedly served to reinforce M.K.'s bond with Ryann and Denisse. We are not unsympathetic to this situation. However, this is the result the law requires. Accordingly, we reverse the juvenile court's order denying DCS's motion for change of physical custody and remand the matter for the court to grant that motion.